**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: KIA VENAY HUTCHINSON | Bankruptcy No. 26-12819-pmm |
| Debtor. | Chapter 13 |

---

**PHILADELPHIA PARKING AUTHORITY'S VERIFIED RESPONSE TO DEBTOR'S MOTION FOR SANCTIONS FOR VIOLATION OF THE AUTOMATIC STAY.**

The Philadelphia Parking Authority ("PPA"), by and through its undersigned counsel, hereby responds to Debtor Kia Venay Hutchinson's Motion for Sanctions for Violation of the Automatic Stay [ECF No. 39] ("Motion").

## I. INTRODUCTION AND SUMMARY.

Debtor's Motion arises from a ***single automated collection notice*** seeking payment of a $120 speed camera fine. That is the entirety of the post-petition conduct at issue. Debtor's vehicle was never booted or towed. Nothing was seized, impounded, or repossessed, and the Debtor paid nothing. Debtor identifies no property that was affected and no money she paid.

PPA does not defend the issuance of the collection notice at issue. The notice, which was mailed to Debtor by PPA's contract vendor which issues speed camera violations and follow-up notices – but which is not involved in enforcement – should not have been mailed after PPA received notice of Debtor's bankruptcy. This Motion has brought to light a narrow and previously unrecognized gap in PPA's speed camera procedures, explained in more detail below, which PPA now is working with its vendor to ensure this does not occur in the future. Moreover, after PPA first learned of the mistaken notice in this case – by the filing of this Motion – PPA immediately withdrew the notice and flagged the underlying violation to guarantee that no further collection activity will occur on the prepetition violation absent relief from the stay or as

otherwise permitted by this Court. This corrective action is consistent with PPA's established and routine procedures to address bankruptcy filings by citizens with open violations, and resolves every item of injunctive relief Debtor requests.

What remains is the Debtor's demand for money – actual damages for emotional distress, attorney's fees and, ostensibly, punitive damages. Here the Motion fails, because Debtor has not pleaded and cannot establish any compensable injury. Section 362(k) of the Bankruptcy Code, 11 U.S.C. § 362(k), does not award statutory or presumed damages; it requires proof of ***actual*** damages, and Debtor bears the burden of proving them ***with specificity***. This Court addressed materially identical facts less than a year ago in *In re Heasley*, 674 B.R. 475 (Bankr.E.D.Pa. 2025)), where a creditor's ***repeated*** automated post-petition collection messages were a willful violation of the stay, yet the Court denied all compensatory relief — emotional-distress damages and fees alike — because ***the debtor suffered no actual harm***. To the extent Debtor is seeking punitive damages, they are categorically unavailable against PPA as a governmental unit under 11 U.S.C. § 106(a)(3).

## II. RELEVANT BACKGROUND.[1]

### A. <u>The Speed Camera Program</u>.

Pursuant to laws enacted by the Commonwealth of Pennsylvania and City of Philadelphia, PPA is tasked to administer the "Speed Camera Program," which utilizes automated speed safety camera systems on certain high-risk streets and highways to detect speeding and reduce traffic crashes. The Speed Camera Program, which launched in 2020, is similar to an older automated enforcement program launched in Philadelphia in 2005, known as the "Red Light Camera Program," which utilizes automated camera systems at high-risk

[1] The facts set forth in this Response are verified by Anthony Kuczynski, PPA's Director of Enforcement, who will be available to testify at the hearing scheduled on the Motion.

intersections to detect red light violations and reduce traffic crashes. Both the Speed Camera Program and Red Light Camera Program have delivered dramatic reductions in crashes and fatalities in Philadelphia.

PPA contracts with a vendor, Verra Mobility ("Verra"), to administer the front end of the Speed Camera Program. (Verra provides automated speed safety camera systems used by numerous other cities and law enforcement agencies like PPA.) Verra issues citations based on violations identified by its systems and follow-up notices if owners do not pay or dispute the citations. Verra does not perform any enforcement activities if a citizen ignores Verra's notices; enforcement – booting, impoundment and sales of vehicles – is performed exclusively by PPA.

It typically takes several weeks after a speed camera violation occurs for Verra to vet the violation and issue a citation to the registered owner(s) of a vehicle on a form titled "Notice of Violation." The citation is ***not*** transmitted to PPA's internal database at that time. If the owner does not contest or pay the citation within 15 days, Verra mails a reminder titled "Reminder Notice." If the ticket still is not paid or disputed 35 days after the issuance of the citation, Verra mails the owner a notice titled "Boot and Tow Eligibility Notice" ("Boot Notice") which warns that failure to address the citation ***could*** result in booting and impoundment of the vehicle. (A vehicle is not inherently subject to booting and impoundment for failure to pay a single citation; vehicles are not subject to seizure under Philadelphia law unless the owner is subject to ***multiple*** delinquent violations.) Only then does Verra transmit to PPA's internal database for purposes of enforcement. Thus, PPA is not made aware of a speed camera citation for almost two months after it is first issued by Verra.

### B. PPA Policies and Procedures Intended to Ensure Compliance with the Automatic Stay.

When a citizen files a bankruptcy petition and identifies PPA as a creditor, PPA takes reasonable measures to ensure that it complies with the automatic stay. This involves tagging all ***existing*** violations in PPA's internal database so that no further enforcement action takes place without further order of the Bankruptcy Court as appropriate (whether relief from the stay, discharge, dismissal of the bankruptcy, etc.). This does not mean that a citizen who files for bankruptcy protection is immune from incurring ***new violations*** post-petition; a pending bankruptcy does not excuse a debtor from being cited for parking, speed camera or red light camera violations no differently than it does not excuse other offenses enforced by police departments. As noted above, Verra is not involved in booting or impounding vehicles. PPA performs those functions and does so only after a Boot Notice is issued and Verra transmits the information regarding the underlying citation to PPA's internal database.

For these reasons, PPA historically has not notified Verra of bankruptcies. PPA admittedly did not anticipate the possibility that Verra would issue a citation for a ***prepetition*** violation after a petition is filed and then follow up with a Boot Notice before PPA receives the citation in its internal database and initiates enforcement. This is precisely what occurred here.

### C. Debtor's Citation and Bankruptcy.

On July 3, 2026, Verra (acting for PPA) issued and mailed speed camera citation number 5072604424394 ("Citation") to Debtor for a violation committed by a vehicle bearing Pennsylvania license plate "LRT-4299" on June 18, 2026. [Motion, at 2, 5.] (PennDOT records list the vehicle as owned by two individuals, Debtor and Baneisha Whitney Wych.) A copy of the Citation is attached as Exhibit 1. Unknown to Verra, on July 1, 2026, Debtor had filed a voluntary petition under Chapter 13 and listed PPA as a creditor.

On July 20, 2026, PPA filed a Proof of Claim, a copy of which is attached as Exhibit 2. Critically, as explained above, ***PPA was not aware of the Citation when it filed its Proof of Claim***, as Verra had not yet transmitted the Citation to PPA's internal database. PPA filed its Proof of Claim because, at the time, PPA's internal database indicated that Debtor had ***approximately 20 other outstanding delinquent violations*** for parking, Speed Camera and/or Red Light Camera violations ***on four different vehicles***. However, ***the Proof of Claim does not include the Citation***.

### D. Verra Mails a Routine Boot Notice to Debtor Based on the Citation without Knowledge of Debtor's Intervening Bankruptcy.

On August 24, 2026, Verra (again acting for PPA) mailed Debtor a Boot Notice demanding payment of the $120 fine and stating that a $20 late penalty had been added, with a further $25 per violation to accrue if payment was not made within thirty days. [Motion at 2 and Exhibit "B."] ***As outlined above, while PPA was by then aware that Debtor had filed a bankruptcy petition, it did not yet at that time have access to the Citation in its internal database.*** Moreover, as explained above, PPA had no procedure or practice to notify Verra of a bankruptcy filed by a citizen ***before*** the issuance of a Citation or Boot Notice. Nor did PPA have procedures to cross-check ***new*** citations against bankruptcies already flagged by PPA on existing citations.

In any event, ***nothing else occurred with respect to the Citation or Boot Notice***. No boot was placed on Debtor's vehicle, the vehicle was not towed or impounded, and Debtor made no payment. Debtor alleges no such action and no such payment.

### E. PPA Immediately Addresses Debtor's Motion for Sanctions.

Neither Debtor nor her counsel contacted PPA to address the Boot Notice before filing the Motion on September 3, 2026. (Debtor's counsel faxed a copy to PPA that same day.)

Debtor alleges that the Boot Notice caused her "emotional distress, including stress, anxiety, and fear of losing her vehicle," and caused her to incur attorney's fees. [Motion at 2.] She seeks a declaration that PPA willfully violated the automatic stay, corrective relief directing withdrawal of the Boot Notice and reversal of the penalties, and an award of actual damages, attorney's fees, and costs. [Motion at 3.]

Upon receiving the Motion, PPA immediately flagged the Citation (which by then had been transmitted to PPA's internal database contemporaneous with the issuance of the Boot Notice) to reverse the Boot Notice and guarantee that no further action would take place pending further order of this Court. PPA also has begun to create procedures to ensure both that Verra does not issue Boot Notices in situations like this and that PPA can promptly identify new citations that are transmitted to its databases after it has become aware of a bankruptcy.

## III. ARGUMENT.

### A. Debtor bears the burden of proving actual damages, and the Court may not presume or speculate them.

Section 362(k)(1) provides that "an individual injured by any willful violation of a stay …shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *In re Odom*, 571 B.R. 687, 693 (Bankr.E.D.Pa. 2017). To recover, Debtor must establish that PPA violated the stay, that the violation was willful, and – critically – that the willful violation "caused [her] some injury." *In re Boltz-Rubinstein*, 596 B.R. 494, 502 (Bankr.E.D.Pa. 2019) (citation omitted); see *Cal. Coast Univ. v. Aleckna (In re Aleckna)*, 13 F.4th 337, 342, 344 n. 37, 346 n. 48 (3d Cir. 2021). Injury is not incidental to the claim; it is "an essential element" of it, and the Code "explicitly requires" that a debtor have been injured and that the creditor's conduct caused "actual" damages the debtor "in fact incurred." *Id.* at 503 (citations omitted).

Because Debtor may only recover actual damages, she "bears the burden of proof," and "damages must be proven with specificity, based on concrete evidence." *In re Heasley*, *supra*, 674 B.R. at 484. "It is not proper for the Court to speculate about the amount of damages" and "the Court cannot 'presume' damages exist." *Id.* at 484, 486.

For purposes of this Response, PPA does not dispute that the mistaken delivery of the Boot Notice by Verra to Debtor was a willful violation of the automatic stay within the meaning of Section 362 of the Code for which PPA is responsible. But this, standing alone, does not allow an award of damages or attorney's fees. The dispositive question is whether Debtor has alleged and can prove ***actual*** injury. She has not and cannot.

**B. Debtor suffered no actual damages.**

The Motion itself discloses no compensable economic damages. No boot was applied, no tow occurred, and no property was seized — the very harms the Boot Notice warned of never materialized. Debtor has not paid the Citation. PPA has withdrawn the Boot Notice. There was no out-of-pocket losses, no lost wages, and no property deprivation of any kind.

This is the same fatal flaw that defeated the damages claim in *In re Heasley*, *supra*. There, the creditor "undoubtedly violated the stay" by sending ***six*** automated collection emails, yet the Court "den[ied] any compensatory relief because the Debtor failed to present any evidence of damages" — "nothing regarding medical treatment, physical injuries, or corroborating testimony," "no evidence of missed work, lost wages, or travel expenses," and no proof of fees actually incurred as a result of the violation. 674 B.R. at 485-86. Accepting the allegations of the Motion at face value, the facts here – a single notice that produced no seizure, no payment, and no out-of-pocket loss —Debtor has an even less compelling claim than the claim rejected in *In re Heasley*.

### C. Debtor cannot recover emotional distress damages as a matter of law, particularly since any violation of the stay was not patently egregious.

Debtor's only asserted harm is emotional. Although the Third Circuit recognizes that "actual damages" under Section 362(k)(1) ***may*** include damages for emotional distress, recovery requires proof that the debtor "suffered 'actual' emotional harm caused by the willful stay violation." *Lansaw v. Zokaites (In re Lansaw)*, 853 F.3d 657, 670 (3d Cir. 2017), *cert. denied*, 583 U.S. 1118, 138 S.Ct. 1001 (2018) (citing Section 362(k)). Not every willful violation and not any emotional distress warrants such an award; the debtor must (1) have suffered significant emotional distress, (2) clearly establish it, and (3) demonstrate a causal connection between that significant distress and the stay violation. *In re Boltz-Rubinstein, supra*, 596 B.R. at 503-04 (Bankr.E.D.Pa. 2019)(citation omitted).

Significantly, "[t]he majority of the courts have denied damages for emotional distress where there is no medical or other hard evidence to show something more than fleeting or inconsequential injury." *In re Wingard*, 382 B.R. 892, 906 (Bankr.W.D.Pa. 2008) (citations and note omitted); see *In re Beebe*, 435 B.R. 95, 99-100 (Bankr.N.D.N.Y. 2010) (emotional-distress damages must be "more than 'fleeting, inconsequential and medically significant'" to be compensable) (citations omitted).

Moreover, the required proof depends on the severity of the violation. As the Third Circuit has held, a debtor's own testimony can support an emotional distress award ***only*** where the stay violation is "patently egregious." *Lansaw v. Zokaites (In re Lansaw), supra*, 853 F.3d at 669. Where the violation is not egregious, the debtor must "prove emotional distress through the introduction of corroborating extrinsic evidence beyond mere self-serving testimony," and must show that the distress is causally distinct from "the anxiety and pressure inherent in the bankruptcy process." *In re Wingard, supra*, 382 B.R. at 905.

In *In re Wingard*, *supra*, a creditor's dunning letters and a collection call – conduct the Court described as "repugnant of our bankruptcy process" — were nonetheless "not 'patently egregious," and the debtor's generalized testimony of poor sleep, elevated blood pressure, an upset stomach, and marital friction, without objective corroboration, therefore failed to support any award. 382 B.R. at 899. Likewise, in *In re Heasley*, *supra*, the Court held that "sending … six (6) automated collection emails" was not "patently or obviously egregious," and the debtor's testimony of "a sense of dread" and "constant stressors" – with no medical evidence, physical injury, or corroborating testimony – could not sustain emotional-distress damages. 674 B.R. at 485-86. The Court contrasted that record with the kind of case in which testimony alone suffices, such as a creditor who broke into the debtor's home and threatened to "blow [his] brains out." 674 B.R. at 486 (citing *Wagner v. Ivory (In re Wagner)*, 74 B.R. 898, 900-01, 906 (Bankr.E.D.Pa. 1987).

Applying these principles, PPA's conduct cannot even arguably be characterized as egregious. PPA's contract vendor, which is not involved in enforcement, mailed a single post-petition collection notice. In this context, Debtor's verified allegation of "stress, anxiety, and fear of losing her vehicle" (Motion at 2) is precisely the sort of generalized, self-reported distress found insufficient in *In re Wingard* and *In re Heasley*. Debtor's emotional distress claim therefore fails as a matter of law.

**D. An award of attorney's fees is not warranted.**

Because the Code provides only for "actual damages, including costs and attorneys' fees," and ***not statutory damages***, courts are reluctant to award damages solely in the form of costs and attorneys' fees, and have "expressed concern with potentially vexatious litigation around otherwise innocuous stay violations with an eye toward collection of only attorneys' fees." *In re Heasley*, *supra*, 674 B.R. at 484 n. 6. This case squarely presents this concern;

given the apparent absence of anything approaching the measure of proof necessary to justify an award of actual damages, it seems that an award of fees is the only ***potentially*** viable recovery.

Moreover, even where fees are recoverable, "the fees and costs must be reasonable and necessary," and the policy of Section 362(k) "is tempered by a reasonableness standard born of courts" reluctance to foster a cottage industry built around satellite litigation." *In re Beebe*, *supra*, 435 B.R. at 101-02 (court denied a $4,700 fee request in its entirety where the underlying collection sought only $219 and the debtor suffered no other harm, holding the fees bore "no relationship" to the stakes and were neither reasonable nor necessary.

Here, the Citation involved a fine of $120 and Debtor suffered no actual damages. Fees should not be awarded in these circumstances.

**E. Debtor may not recover punitive damages against PPA as a governmental entity.**

To the extent Debtor's request for "further relief" is read to seek punitive damages, they are unavailable as a matter of law. Although Section 362(k)(1) permits an award of punitive damages "in appropriate circumstances," that general authorization is overridden, as to a governmental unit, by 11 U.S.C. § 106(a)(3). Section 106(a) abrogates sovereign immunity with respect to the enumerated Code provisions – including Section 362 – and provides that the court "may issue against a governmental unit an order, process, or judgment …including an order or judgment awarding a money recovery, but not including an award of punitive damages." This bar is categorical; it does not depend on the nature of the creditor's conduct.

PPA is clearly a "governmental unit" within the meaning of the Code. See 11 U.S.C.A. § 101. Indeed, this precise question has already been decided in PPA's favor by this Court in *In re Odom*: "PPA invokes [Section 106 (a)(3)] for the limited purpose of defeating any claim for punitive damages. [PPA] is entitled to this relief." 571 B.R.at 698.

Even setting this statutory bar aside, the facts would not support punitive damages, which are available only "in appropriate circumstances." These are not such circumstances. An isolated, promptly corrected administrative error – with no seizure of property, no coercion, and no defiance of the Court – is the antithesis of the egregious or malicious conduct that punitive damages exist to punish and deter.

**CONCLUSION**

For the foregoing reasons, the Philadelphia Parking Authority respectfully requests that the Court deny Debtor's Motion for Sanctions.

/s/ Patrick J. Doran
Patrick J. Doran
Attorney for Philadelphia Parking Authority

**OF COUNSEL**:
Archer & Greiner, P.C.
Three Logan Square
Suite 3500
Philadelphia, PA 19103
215-963-3300
Fax: 215-963-9999
pdoran@archerlaw.com

Docusign Envelope ID: 4A9C83B7-CEB3-8D4A-82B2-6C8539C16397


# VERIFICATION

Anthony Kuczynski, being first duly sworn according to law, deposes and says that he is the Director of Enforcement of the Philadelphia Parking Authority ("PPA"), that he is authorized to make this Verification on PPA's behalf, that he has reviewed the foregoing Motion for Sanctions, and that the statements made therein are true and correct based upon his personal knowledge or, otherwise, on information and belief. This Verification is made subject to the penalties of perjury.

Signed by:

Anthony Kuczynski

9C055119E70449C...

Anthony Kuczynski

Dated: October 2, 2026

232480373 v1

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In re: KIA VENAY HUTCHINSON

Debtor.

Bankruptcy No. 25-12819-pmm

Chapter 13

**CERTIFICATE OF SERVICE**

I, Patrick J. Doran, Esquire, of Archer & Greiner, P.C., counsel for Philadelphia Parking Authority hereby certify that, on October 2, 2026, I caused to be served copies of *Philadelphia Parking Authority's Response To Motion for Sanctions for Violation of Automatic Stay* upon the parties listed on the attached Service List as indicated thereon.

/s/ Patrick J. Doran
Patrick J. Doran, Esquire
Archer & Greiner, P.C.
Three Logan Square
Suite 3500
Philadelphia, PA 19103
215-963-3300
pdoran@archerlaw.com
*Attorney for Philadelphia Parking Authority*

**SERVICE LIST**

**BY ELECTRONIC FILING**

Michael I. Assad, Esquire
Law Office of Mike Assad, P.C.
923 Haddonfield Road
Suite 336
Cherry Hill, NJ 08002
mike@assad.law
Counsel for Debtor

Kenneth E. West, Trustee
Office of the Chapter 13 Standing Trustee
190 N. Independence Mall West
Suite 701
Philadelphia, PA 19106

Office of United States Trustee
Robert N.C. Nix Federal Building
900 Market Street
Suite 320
Philadelphia, PA 19107

232753514 v3